987 A.2d 72

**Robert BAILEY**

v.

**STATE of Maryland.**

**No. 10, Sept. Term, 2009.**

Court of Appeals of Maryland.

Jan. 14, 2010.

352

354

356

**358**

Piedad Gomez, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore, MD), on brief, for Petitioner.

Carrie J. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, Judge.

In this case, we are asked to determine whether the search and seizure of the petitioner, Robert Bailey, violated the Fourth Amendment to the United States Constitution and the Maryland Declaration of Rights. To reach a decision, we must consider whether the odor of ether, a lawful substance that is allegedly associated with contraband, constitutes probable cause to support an arrest when the arrestee, who is standing in a high crime drug area, has the odor of ether emanating from his person, and fails to respond to police questions. We shall hold that the totality of the circumstances do not provide a concrete reason to associate the odor of ether with criminal activity or contraband, and, accordingly, the officer did not have probable cause to arrest the petitioner.

## I.

On the night of August 16, 2006, Officer Rodney Lewis of the Prince George's County Police Department was patrolling the 6800 block of Hawthorne Street in Landover, Maryland. The area was known for drug activity, though there were no specific complaints on the night in question. At approximately 11:35 P.M., while patrolling on foot, Officer Lewis spotted the

petitioner, Robert Bailey, standing alone on the side of 6890 Hawthorne Street. Officer Lewis testified about the encounter at the suppression hearing:

> ... I observed the defendant standing on the side of a home, ... just standing in the shadows, at which time I yelled out to him, "Excuse me, sir, do you live there?" I didn't get any acknowledgment from the individual, at which time I assumed that he probably didn't hear me. I repeated the same thing, "Excuse me, sir, do you live there," which again I received no acknowledgment from the suspect, at which time myself, along with another officer, walked over to the individual. At that time, I just happened to step out of the shallow [sic] area on the sidewalk where I could visibly see his hands. And from the area at which he was standing at the time, I could smell a strong odor of ether ...

When Officer Lewis smelled the odor of ether, he was within a few feet of the petitioner, close enough to "reach out and touch him." The odor was emanating "[f]rom [the petitioner's] body odor." The odor of ether, according to Officer Lewis's testimony, is associated with phencyclidine, more commonly known as PCP.[1] Officer Lewis acknowledged on cross-

---

1. There was no clear evidence presented at the suppression hearing about the relationship between the odor of ether and the presence of PCP. On direct examination, Officer Lewis testified that PCP has "[a]n odor of ether." On cross-examination, there was testimony that ether is a solvent and that ether is "chemically made up" with PCP, but Officer Lewis acknowledged that he did not know the nature of the chemical makeup. Officer Lewis was not qualified as a Drug Recognition Expert or expert witness. *See Ragland v. State*, 385 Md. 706, 726, 870 A.2d 609, 621 (2005) (holding that expert testimony would be admitted only upon a finding that the requirements of Md. Rule 5–702 were satisfied). For example, Drug Recognition Expert protocols were originally developed by the Los Angeles Police Department as a means of detecting drivers who are impaired by controlled substances. In the 1980s, the National Highway Traffic Safety Administration and the International Association of Chiefs of Police developed a certification and training program for Drug Recognition Expert (DRE) officers. Thirty-three states, including Maryland, have formal DRE programs.

 The DRE protocol has three major functions. First, it attempts to determine the existence of impairment in a driver and to determine

examination that it is not illegal to possess ether and that ether is a solvent that is used in several household products. Upon smelling the odor of ether, Officer Lewis "reached over and grabbed both of [the petitioner's] hands and ... had him place them over top of his head." Officer Lewis then conducted a search of the petitioner, which uncovered a glass vial, approximately three to four inches in length and one inch in diameter, half-full of liquid,[2] in the petitioner's right front pants pocket. Field tests confirmed that the liquid contained PCP, and the petitioner was subsequently taken into custody and charged with possession of a controlled dangerous substance.

People under the influence of PCP, according to Officer Lewis's testimony, "possess various strengths, sometimes they could be incoherent in reference to trying to understand if someone is saying something to them, and very glossy [sic] eyes...."[3] Officer Lewis did not explain what he meant by "glossy" eyes or elaborate any further. In addition to observing the odor of ether, Officer Lewis noted that the petitioner had "glossy eyes" and that the petitioner failed to respond to the inquiries about whether he lived in the house. Officer Lewis did not, however, indicate whether he observed the petitioner's glossy eyes before or after he initially seized the petitioner.

The petitioner moved to suppress the physical evidence recovered from the search, asserting that the glass vial was

---

whether that impairment is caused by alcohol or drugs. Second, it asks whether the cause of the impairment is something other than alcohol or drugs, such as a medical condition. Third, if the impairment is caused by drugs, the DRE protocol purports to identify which drug, among seven broad categories, covered the impairment. *State v. Sampson*, 167 Or.App. 489, 6 P.3d 543, 548 (2000) (footnote omitted). The DRE officer follows a series of twelve protocols to make the determination. *Id.*

**2.** The suppression hearing record does not indicate whether the liquid had a color or odor.

**3.** In his testimony, Officer Lewis used the term "glossy" to describe the petitioner's eyes. The term "glassy" appears in other parts of the transcript, but Officer Lewis only used the term "glossy."

the fruit of an illegal search and seizure under the Fourth Amendment, as well as the Maryland Declaration of Rights. Following a suppression hearing at which Officer Lewis was the sole witness, the trial court found that Officer Lewis had reasonable articulable suspicion to stop and question the petitioner based on the smell of ether, the petitioner's failure to respond to Officer Lewis's questions,[4] and the petitioner's presence in a "high crime drug area with a number of complaints from citizens." The suppression court also determined that Officer Lewis conducted a valid pat-down of the petitioner for "officer safety" and that, based on the totality of the circumstances, the search and seizure were valid.

The petitioner proceeded to trial on an Agreed Statement of Facts. The State entered a nol pros as to the first count, possession of a controlled dangerous substance with intent to distribute. Based upon the Agreed Statement of Facts, the Circuit Court for Prince George's County entered verdicts of guilty to the second count, possession of a controlled dangerous substance, and sentenced the petitioner to four years in prison, all but two years suspended, with three years of supervised probation upon release.

The petitioner filed a timely appeal to the Court of Special Appeals. The intermediate appellate court, in an unreported opinion, affirmed the judgment of the trial court. The court determined that Officer Lewis had a reasonable, articulable suspicion to conduct an investigatory stop based on the odor of ether, the petitioner's "glossy" eyes, the petitioner's presence "in the shadows" in a high drug crime area, and the petitioner's failure to respond to Officer Lewis's inquiries. The court also held that

> the officer's testimony did not provide a basis for a frisk, [but] it did provide probable cause for arresting [the petitioner] for the possession of illegal drugs and hence search-

---

4. The Circuit Court found that "[the petitioner is] not required to respond to the questions, but that certainly gives Officer Lewis reason to approach the defendant and the right to determine the individual's name and address."

ing him. That is to say, although Officer Lewis did not articulate a reasonable suspicion for believing [the petitioner] had weapons in his possession, he did have probable cause to arrest [the petitioner] for the possession of unlawful drugs, and therefore he had the lawful authority to conduct a search incident to that arrest.

The court based its probable cause determination on "the smell of material clearly associated with illegal drugs ... combined with both the appearance and conduct of [the petitioner]," specifically his "glossy" eyes, failure to respond to Officer Lewis's inquiries, and presence in a high drug crime area "standing in the shadows at 11:30 p.m. ... back off the street, well in the shadows."

## II.

"When reviewing the disposition of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment ..., we view the evidence adduced at the suppression hearing, and the inferences fairly deducible therefrom, in the light most favorable to the party that prevailed on the motion." *Crosby v. State*, 408 Md. 490, 504, 970 A.2d 894, 902 (2009); *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007). The appellate court defers to the trial court's fact-finding at the suppression hearing, unless the trial court's findings were clearly erroneous. *Crosby*, 408 Md. at 504–05, 970 A.2d at 902. "Nevertheless, in resolving the ultimate question of whether the detention or attendant search of an individual's person or property violates the Fourth Amendment, we 'make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case.' " *Crosby*, 408 Md. at 505, 970 A.2d at 902 (quoting *State v. Williams*, 401 Md. 676, 678, 934 A.2d 38, 40 (2007)); *Longshore*, 399 Md. at 499, 924 A.2d at 1136. Thus, this Court considers the evidence adduced at the suppression hearing, construed in the light most favorable to the State as the prevailing party at the suppression hearing.

III.

 The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." When the police obtain evidence through a search or seizure that violates the Fourth Amendment, "exclusion of evidence obtained in violation of these provisions is an essential part of the Fourth Amendment protections." *Swift v. State*, 393 Md. 139, 149, 899 A.2d 867, 873 (2006) (citing *Mapp v. Ohio*, 367 U.S. 643, 655–56, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961); *State v. Lee*, 374 Md. 275, 297–98, 821 A.2d 922, 934–35 (2003)). The Fourth Amendment, however, is "not implicated in every situation where the police have contact with an individual." *Swift*, 393 Md. at 149, 899 A.2d at 873 (citing *California v. Hodari D.*, 499 U.S. 621, 625–26, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991); *Scott v. State*, 366 Md. 121, 133, 782 A.2d 862, 869 (2001)). This Court analyzed the applicability of the Fourth Amendment to varying levels of police interaction in *Swift*, 393 Md. at 149–51, 899 A.2d at 873–74:

Many courts have analyzed the applicability of the Fourth Amendment in terms of three tiers of interaction between a citizen and the police. The most intrusive encounter, an arrest, requires probable cause to believe that a person has committed or is committing a crime. The second category, the investigatory stop or detention, known commonly as a *Terry* stop, is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual.... The least intrusive police-citizen contact, a consensual encounter, ... involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. A consensual encounter need not be supported by any suspicion and because an individual is free to leave at any time during such an encounter, the Fourth Amendment is not implicated; thus, an individual is not considered

to have been 'seized' within the meaning of the Fourth Amendment.

*Id.* (internal citations omitted). We will consider how the petitioner's encounter with Officer Lewis proceeded from consensual encounter to custodial arrest, in light of settled Fourth Amendment precedent. *See id.*

### IV. Consensual Encounter or Investigatory Stop

We agree with the intermediate appellate court that Officer Lewis's initial questioning of the petitioner was not an investigative stop, but rather a "consensual encounter" or accosting. As *Swift,* 393 Md. at 151, 899 A.2d at 874, instructs us, a consensual encounter does not implicate the Fourth Amendment because the individual with whom the police are interacting is free to leave at any time. The Court of Special Appeals analyzed the petitioner's encounter with Officer Lewis as follows:

> When the police officers asked [the petitioner] if he lived at the house in whose shadows he was standing, [the petitioner] could not have reasonably believed that the police were doing anything more than making a routine inquiry. The officers' inquiry was a request for basic information, not an order. Officer Lewis "yelled" the question because of the distance between the officers and [the petitioner], and the officers began to walk toward [the petitioner] only after he did not respond to their questions, presumably to find out why he had not.... In sum, [the petitioner] was not seized by the officers but merely was accosted at the point at which the officers began to approach him.

Thus, this Court need not consider whether Officer Lewis had reasonable articulable suspicion of criminal activity when he decided to approach the petitioner after the petitioner twice failed to respond to his question. There was no investigative stop of the petitioner under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

### V. Seizure and Search

■■■■ "An encounter has been described as a fluid situation, and one which begins as a consensual encounter may lose its consensual nature and become an investigatory detention or arrest once a person's liberty has been restrained and the person would not be free to leave." *Swift*, 393 Md. at 152, 899 A.2d at 874–75. Officer Lewis's testimony indicates that his encounter with the petitioner proceeded quickly from an accosting, in which he shouted questions to the petitioner from the street, to a physical detention, when he grabbed the petitioner's hands.

> As the Supreme Court observed in *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16, "[w]hen the officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen [we may] conclude that a 'seizure' has occurred." In determining whether a person has been seized, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"

*Swift*, 393 Md. at 152–53, 899 A.2d at 875 (quoting *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988))). The inquiry is fact-specific and based on the perception of a reasonable person under the totality of the circumstances. *E.g., Bostick*, 501 U.S. at 439, 111 S.Ct. at 2389, 115 L.Ed.2d at 401–02 ("We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all circumstances surrounding the encounter. . . ."). This Court identified factors that are probative of whether a reasonable person would feel free to leave in *Ferris v. State*, 355 Md. 356, 377, 735 A.2d 491, 502 (1999), including

> the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated

him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave.

In the present case, it is clear that, once Officer Lewis grabbed the petitioner's hands and placed them over his head, a reasonable person in the petitioner's position would have understood that he was physically detained and thus not free to leave or go about his business. Thus, when Officer Lewis grabbed the petitioner's hands, he seized the petitioner for purposes of the Fourth Amendment.

Because the officer seized and searched the petitioner without a warrant, the seizure was presumptively. invalid unless it was supported by a reasonable, articulable suspicion of a threat to officer safety or by an exception to the warrant requirement. *Belote v. State,* 411 Md. 104, 112, 981 A.2d 1247, 1252 (2009); *Wilson v. State,* 409 Md. 415, 439, 975 A.2d 877, 892 (2009). "It is well established that the State has the burden of proving the legality of a warrantless search and seizure." *Paulino v. State,* 399 Md. 341, 348, 924 A.2d 308, 312 (2007) (citing *Sifrit v. State,* 383 Md. 77, 114, 857 A.2d 65, 86 (2004); *State v. Bell,* 334 Md. 178, 191, 638 A.2d 107, 114 (1994); *Stackhouse v. State,* 298 Md. 203, 217, 468 A.2d 333, 341 (1983)). We must consider whether this seizure of the petitioner was a temporary detention and protective frisk pursuant to *Terry,* as the Circuit Court found, or a lawful arrest of the petitioner, as the Court of Special Appeals held.

### VI. *Terry* Frisk

We disagree with the Circuit Court's conclusion that the search and seizure of the petitioner was an investigatory stop and protective frisk pursuant to *Terry.*[5] The pur-

---

5. This Court need not consider whether Officer Lewis had reasonable articulable suspicion for a *Terry* stop because no investigatory stop took

pose of a protective *Terry* frisk is "not to discover evidence, but rather to protect the police officer and bystanders from harm." *Longshore*, 399 Md. at 508, 924 A.2d at 1141 (quoting *State v. Smith*, 345 Md. 460, 465, 693 A.2d 749, 751 (1997)). Pat-down frisks are proper when the officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Longshore*, 399 Md. at 508– 09, 924 A.2d at 1141 (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909). The officer has reason to believe that an individual is armed and dangerous if a reasonably prudent person, under the circumstances, would have felt that he was in danger, based on reasonable inferences from partic-ularized facts in light of the officer's experience. *Longshore*, 399 Md. at 509, 924 A.2d at 1141–42.

■■■ Even if we were to assume that the encounter with the Officer Lewis was a *Terry* stop, "[t]he reasonableness of a *Terry* stop is determined by considering '[w]hether the offi-cer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justi-fied the interference in the first place.' " *Longshore*, 399 Md.

---

place. Pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, "a police officer who has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion." *Crosby v. State*, 408 Md. 490, 506, 970 A.2d 894, 903 (2009) (quoting *Nathan v. State*, 370 Md. 648, 660, 805 A.2d 1086, 1093 (2002)). Police conduct a *Terry* investigation

> by asking "the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." The detainee is not obligated to respond, however, and, "unless the detainee's answers provide the officer with probable cause to arrest him, he must be released."

*Crosby*, 408 Md. at 506, 970 A.2d at 903 (quoting *Collins v. State*, 376 Md. 359, 368, 829 A.2d 992, 997 (2003) (internal citations omitted)); *see Terry*, 392 U.S. at 10, 88 S.Ct. at 1874, 20 L.Ed.2d at 899. In this case, no such questioning took place. Officer Lewis proceeded from an accosting, in which he called out to the petitioner from the street, to a physical detention of the petitioner, when he grabbed the petitioner's hands, without asking any additional questions.

at 506, 924 A.2d at 1140 (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905). Further, assuming *arguendo* that Officer Lewis had reasonable, articulable suspicion to believe that criminal activity was afoot and, accordingly, detain the petitioner, he still lacked the basis for a protective *Terry* frisk. At the suppression hearing, Officer Lewis indicated that he searched the petitioner to "[c]heck for weapons," but did not provide any basis for his suspicion that the petitioner was armed and dangerous. Officer Lewis did not testify as to any factors that would lead to a suspicion that the petitioner was carrying a weapon. Further, there are no objective factors in the record that indicate that the petitioner was armed and dangerous. Although the encounter took place at nighttime, the petitioner was alone and the officer "could visibly see his hands," which, presumably because the officer did not indicate otherwise, were empty. There is no indication in the record that the petitioner made any threatening movements, or any movements at all, nor is there any indication that Officer Lewis suspected that the petitioner was dealing drugs. Thus, we concur with the Court of Special Appeals, and hold that Officer Lewis had no basis to conduct a protective frisk.[6]

Even if Officer Lewis had reasonably believed that the petitioner was armed and dangerous, therefore providing the basis for a proper *Terry* frisk, the search in the present case exceeded the scope of a proper protective frisk. A proper *Terry* frisk is limited to a pat-down of the outer clothing "not to discover evidence of a crime, but rather to protect the police officer and bystanders from harm" by checking for weapons. *In re David S.,* 367 Md. 523, 544, 789 A.2d 607, 619 (2002).

---

6. The Circuit Court did not consider whether Officer Lewis had probable cause to arrest the petitioner. The court's finding that the search was a valid *Terry* frisk requires the application of the standard of reasonable articulable suspicion, "a less demanding standard than probable cause." *Longshore v. State,* 399 Md. 486, 507, 924 A.2d 1129, 1140 (2007) (citing *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989)).

If during a lawful pat-down an officer feels an object which obviously is not a weapon, further patting of it is not permissible. The Supreme Court has made it clear that "if the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." On the other hand, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity *immediately apparent,* there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons."

*Id.* (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 373, 375, 113 S.Ct. 2130, 2136–37, 124 L.Ed.2d 334 (1993)) (internal citations omitted) (emphasis added). Generally, "a pat down is . . . a proper, minimally intrusive means of determining whether a suspect is armed." *State v. Smith,* 345 Md. at 465–66, 693 A.2d at 751.

 The officer may not exceed the limited scope of a patdown for weapons to search for contraband. "General exploratory searches are not permitted [pursuant to *Terry*], and police officers must distinguish between the need to protect themselves and the desire to uncover incriminating evidence." *In re David S.,* 367 Md. at 545, 789 A.2d at 619 (quoting *State v. Smith,* 345 Md. at 465, 693 A.2d at 751) (holding that the officer exceeded the permissible scope of a *Terry* frisk when he opened a bag found in the individual's waistband after realizing the bag did not contain a weapon). If the pat-down uncovered an object that is not a weapon and "the incriminating character of the object was not immediately apparent . . . [but] [r]ather, the officer determined that the item was contraband only after conducting a further search," then the further search exceeded the permissible scope of *Terry. Smith,* 345 Md. at 470, 693 A.2d at 754 (quoting *Dickerson,* 508 U.S. at 379, 113 S.Ct. at 2139, 124 L.Ed.2d at 347–48 (citation omitted)).

In the present case, Officer Lewis testified that he patted down the petitioner's right front pocket and that he did not

manipulate the object contained therein. Officer Lewis testified that he "felt and recognized a glass vial in [the petitioner's] pocket." He further testified that generally, in his experience, PCP is "[c]ontained in a glass vial." Based on Officer Lewis's testimony, however, the incriminating nature of the object in the defendant's pocket was not immediately apparent upon his initial touch of the object in the pat-down. Rather, Officer Lewis testified that he field-tested the liquid contained in the vial after removing it from the petitioner's pocket, thereby determining that the liquid contained PCP. The removal of the vial from the petitioner's pocket and field test of the liquid contained in the vial constituted a general exploratory search exceeding the permissible scope of a protective *Terry* frisk. Accordingly, we hold that Officer Lewis lacked the proper basis for a *Terry* frisk at the inception of the search, and that the search was a general exploratory search that exceeded the permissible scope of a *Terry* frisk, which serves as a basis to exclude the evidence seized from the petitioner's pocket.

## VII. Arrest

We must consider, alternatively, whether Officer Lewis's seizure of the petitioner in the present case constituted a de facto arrest, as the Court of Special Appeals determined.[7] This Court analyzed what constitutes an arrest in *Bouldin v. State*, 276 Md. 511, 515–16, 350 A.2d 130, 133 (1976).

> It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another ... by touching or putting hands on him.... It is said that four elements must ordinarily coalesce to constitute a legal arrest: (1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested.

7. The consideration of whether an arrest took place cannot "save" an unconstitutional *Terry* frisk, but rather is the application of a separate analysis.

In *Belote v. State,* 411 Md. at 117, 981 A.2d at 1254, this Court further analyzed the factors set forth in *Bouldin:*

> [W]here a police officer's objective conduct unambiguously reflects an intent to make a custodial arrest, the subjective intent inquiry ... takes on less significance. In other words, when an arresting officer's objective conduct, which provides significant insight into the officer's subjective intent, is unambiguous, courts need not allocate significant weight to an officer's subjective intent that is revealed partially in the form of his testimony at the suppression hearing; the officer's objective conduct, in effect, will have made his subjective intent clear.

A show of force is objective conduct demonstrating the officer's intent to make an arrest. "[G]enerally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest." *Longshore,* 399 Md. at 502, 924 A.2d at 1138. In *California v. Hodari D.,* 499 U.S. at 626, 111 S.Ct. at 1550, 113 L.Ed.2d. at 697, the Supreme Court of the United States held that "[a]n arrest requires ... physical force" by "laying on of hands or application of physical force to restrain movement." Although the display of force often involves placing the individual who is seized in handcuffs, application of handcuffs is not a necessary element of an arrest. *See Grier v. State,* 351 Md. 241, 252, 718 A.2d 211, 217 (1998) ("Once Petitioner was on the ground and in custody and control of the officers, he was certainly under arrest. Although [the officer] may have had the right to simply detain and question Petitioner before placing him in custody, he did not do so." (citations omitted)); *Morton v. State,* 284 Md. 526, 530, 397 A.2d 1385, 1388 (1979) (holding, where an officer removed the individual from a recreation center and placed him under guard in a patrol car, that "an arrest is the taking ... by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest.... [The officer's] manual seizure of the appellant and the subsequent restraint of his liberty plainly constituted an arrest."); *Dixon v. State,* 133 Md.App. 654, 673, 758 A.2d 1063, 1073 (2000) (officers exceeded the permissible

scope of an investigative *Terry* stop and "arrested appellant at the time they blocked his car, removed him from his vehicle, and handcuffed him").[8]

■ As the Court of Special Appeals stated in *Dixon*, 133 Md.App. at 670, 672, 758 A.2d at 1071–72, before the Supreme Court's landmark decision in *Terry*, " 'the Fourth Amendment's guarantee against unreasonable seizures of persons was analyzed in terms of arrest, [and] probable cause for arrest.' ... *Terry* constituted a limited departure from the requirement of probable cause to support a seizure." *Id.* (quoting *Dunaway v. New York*, 442 U.S. 200, 207–08, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979)).[9] If a seizure and subse-

---

8. Conversely, even if the officers' physical actions are equivalent to an arrest, the show of force is not considered to be an arrest if the actions were justified by officer safety or permissible to prevent the flight of a suspect. *In re David S.*, 367 Md. 523, 539–40, 789 A.2d 607, 616 (2002) (holding that a "hard take down" in which officers forced the individual to the ground and handcuffed him was a limited *Terry* stop, not an arrest, when the "conduct was not unreasonable because the officers reasonably could have suspected that the respondent posed a threat to their safety"); *Trott v. State*, 138 Md.App. 89, 118, 770 A.2d 1045, 1062 (2001) (holding that "the handcuffing of appellant was justifiable as a protective and flight preventive measure pursuant to a lawful stop and did not necessarily transform that stop into an arrest"). The use of handcuffs in a seizure is not a dispositive factor in determining whether the seizure was a *Terry* stop or an arrest.

9. The Supreme Court of the United States discussed the distinction between an arrest and a *Terry* stop in *United States v. Robinson*, 414 U.S. 218, 228, 94 S.Ct. 467, 473, 38 L.Ed.2d 427, 436–37 (1973):

 An arrest is a wholly different kind of intrusion upon individual freedom from a limited search for weapons, and the interests each is designed to serve are likewise quite different. An arrest is the initial stage of a criminal prosecution. It is intended to vindicate society's interest in having its laws obeyed, and it is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows. The protective search for weapons, on the other hand, constitutes a brief, though far from inconsiderable, intrusion upon the sanctity of the person.

 *Id.* (quoting *Terry*, 392 U.S. at 25–26, 88 S.Ct. at 1882, 20 L.Ed.2d 889 (footnote omitted)). "The distinction between a *Terry* stop and an arrest is not defined simply by the length of the detention, the investigative activities during the detention, and whether the suspect was removed to a detention or interrogation area." *Longshore*, 399 Md. at 515–16, 924 A.2d at 1146. In addition to the relevant factors identified

quent search is not justified by reasonable, articulable suspicion that the individual is armed pursuant to *Terry*, the seizure is a de facto arrest and must be supported by probable cause in order to be lawful.

In this case, Officer Lewis's conduct constituted an unambiguous show of force. He approached the petitioner while in uniform, physically restrained the petitioner, conducted a search of the petitioner's person, and ultimately took the petitioner into physical police custody. *Belote*, 411 Md. at 117, 981 A.2d at 1254, instructs us that, although Officer Lewis testified at the suppression hearing that he was checking the petitioner for weapons, this statement is given less weight than his objective conduct on the night in question.[10] Officer Lewis's conduct demonstrates that he intended to take the petitioner into physical custody, he acted with actual authority and physically seized the petitioner, and the petitioner had a clear understanding that he was not free to leave.

Although Officer Lewis describes his encounter with the petitioner as a "pat-down" to "check . . . around the waistband where you're able to conceal . . . weapons," the totality of the circumstances show that the encounter constituted a de facto arrest, albeit described as a *Terry* stop. Officer Lewis's

---

in *Longshore,* an arrest is distinguishable from a Terry detention because the *Terry* stop is not only limited in duration, but also has a limited permissible scope. The scope of a *Terry* stop is limited to brief investigatory stops or detentions "conducted in furtherance of the goal of protecting the safety of the officer[,]" or the safety of bystanders. *Longshore, 399 Md.* at 508, 924 A.2d at 1141.

10. The rationales supporting a search incident to arrest are: (1) to check the arrestee for weapons that might be used to harm the officer or escape and (2) to recover evidence that might be destroyed by the arrestee. *Belote v. State,* 411 Md. 104, 113, 981 A.2d 1247, 1252 (2009) (citing *United States v. Robinson,* 414 U.S. at 234, 94 S.Ct. at 476, 38 L.Ed.2d at 439–40; *Chimel v. California,* 395 U.S. 752, 764, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694 (1969)). The *Terry* frisk, however, is limited to the purpose of ensuring officer safety, not the discovery of evidence. *Longshore,* 399 Md. at 508, 924 A.2d at 1141 (quoting *State v. Smith,* 345 Md. 460, 465, 693 A.2d 749, 751 (1997)). In the present case, Officer Lewis reached into the petitioner's pockets for the purpose of discovering evidence of PCP possession.

conduct on the night in question exceeded the permissible boundaries of an investigative *Terry* stop, both in scope and in duration. A *Terry* stop must be justified both at its inception and be limited in scope, for the specific purpose of searching for weapons to protect the officer's safety, or the safety of bystanders. In the present case, the officer took complete control of the situation in conducting a general exploratory search of the petitioner, removing the vial from his pocket and taking him into custody. As discussed *infra*, the officer had no objective reason to suspect that the petitioner was armed and dangerous, nor did the officer's testimony furnish a basis for a suspicion that the petitioner was armed. Further, the search itself exceeded the scope of a valid *Terry* frisk. The search undertaken in the present case was only valid if it was undertaken within the context of an arrest, which must be supported by probable cause.

Grabbing the petitioner's wrists when he was not suspected of being armed and dangerous, then conducting a search and removing the vial from his pocket, and, finally, taking him into custody as the initial action leading up to a criminal prosecution, constituted a de facto arrest. Thus, we hold that Officer Lewis's seizure, in which he physically restrained the petitioner and ultimately took him into custody, constituted an arrest.

VIII. Probable Cause Supporting a Warrantless Arrest

 We must now consider whether Officer Lewis's arrest of the petitioner was lawful. "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Longshore*, 399 Md. at 501, 924 A.2d at 1137 (citing *United States v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598, 606 (1976)); *State v. Evans* 352 Md. 496, 511, 723 A.2d 423, 429 (1999).

> Probable cause, we have frequently stated, is a nontechnical conception of a reasonable ground of a belief of guilt. A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than

would merely arouse suspicion. Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge.... Therefore, to justify a warrantless arrest the police must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion.

*State v. Wallace,* 372 Md. 137, 148, 812 A.2d 291, 297–98 (2002) (quoting *Collins v. State,* 322 Md. 675, 680, 589 A.2d 479, 481 (1991)) (internal citations omitted); *Illinois v. Gates,* 462 U.S. 213, 230–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527, 543–45 (1983). In the case of a search incident to arrest, the State must show that probable cause supported a lawful arrest before the officer conducted the search. *Bouldin,* 276 Md. at 515, 350 A.2d at 132; *see also Davids v. State,* 208 Md. 377, 385, 118 A.2d 636, 639 (1955) (evidence seized following the arrest cannot be taken into consideration in determining whether the officer had probable cause to make the arrest). We shall consider only what the officer articulated as the basis for the seizure: the smell of ether emanated from the petitioner's person, the petitioner was standing next to a house in a high drug crime area, and the petitioner did not respond to Officer Lewis's questions.[11] We hold that, based on what Officer Lewis knew at the moment that he seized the petitioner, he did not have probable cause to believe that the petitioner had committed or was committing a crime.

The petitioner argues that, considering the totality of the circumstances, the facts do not constitute probable cause to show that he was committing a crime on the night in question. Although the intermediate appellate court held that "knowl-

---

11. It is unclear from Officer Lewis's testimony whether he observed the petitioner's glossy eyes before or after he seized the petitioner. The Circuit Court did not make a finding on this issue and did not rely on the testimony about the petitioner's glossy eyes when making its determination that Officer Lewis had reasonable suspicion to stop the petitioner. Likewise, we will not consider the testimony about "glossy eyes" in our analysis.

edge gained from the sense of smell alone may be of such character as to give rise to probable cause for a belief that a crime is being committed" in *Ford v. State*, 37 Md.App. 373, 379, 377 A.2d 577, 580 (1977) (applying *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)), the substance in question in *Ford*, marijuana, was contraband and had a distinctive identifying odor. In the present case, the substance in question, ether, is not contraband. Possession of ether is not a criminal act, nor did the surrounding circumstances provide a substantial basis for a suspicion that the petitioner possessed contraband. The petitioner also examines cases from a variety of jurisdictions that directly addressed the odor of ether or PCP as part of a probable cause analysis. The petitioner distinguishes the cases involving the odor of ether or other lawful substances on the basis that, in those cases, the odor of ether was accompanied by factors strongly suggesting the presence of contraband. Unlike in those cases, there are no significant corroborating factors here.

The State argues that several courts in other jurisdictions have found that the smell of ether alone is sufficient to establish probable cause. The State maintains that, even if this were not the case, the other factors present, such as standing in the shadows in a known drug area and characteristics consistent with PCP intoxication, provide an additional basis for establishing probable cause.

■■ It is well-established that odor is a valid consideration in the probable cause analysis. *United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684, 690 (1965) (observation of 60lb bags of sugar, empty tin cans, and odor of mash whisky provided sufficient probable cause for a search warrant); *Ford*, 37 Md.App. at 379, 377 A.2d at 580 ("[K]nowledge gained from the sense of smell alone may be of such character as to give rise to probable cause for a belief that a crime is being committed in the presence of the officer.") Maryland courts have previously held that the odor of contraband alone is sufficient to establish probable cause for a belief

that contraband is present. *Ford,* 37 Md.App. at 379, 377 A.2d at 580; *see also Waugh v. State,* 275 Md. 22, 30, 338 A.2d 268, 272 (1975) (noting in dicta that "if Detective Schwartz had actually smelled what he believed to be the odor of marijuana coming from the suitcases, this would have constituted probable cause for him to have searched the suitcases"). Maryland courts, however, have not held that the odor of a lawful substance that is allegedly associated with contraband constitutes probable cause for a belief that contraband is present.

The Supreme Court of Kansas recently addressed the issue of whether the odor of ether constitutes probable cause for a warrantless search of a vehicle in *State v. Ibarra,* 282 Kan. 530, 147 P.3d 842 (2006). During a routine traffic stop, the officer smelled a strong odor of ether emanating from the vehicle. *Ibarra,* 147 P.3d at 844–45. Based on the odor of ether, the officer searched the vehicle. *Ibarra,* 147 P.3d at 845. The search uncovered at black bag containing a glass container of white powder. *Id.* Field tests confirmed that the powder was methamphetamine. *Id.* In considering whether the officer had probable cause to search Ibarra's vehicle based on the smell of ether, the Supreme Court of Kansas noted that the odor of contraband, including marijuana and alcohol, can constitute probable cause to support a warrantless search. *Ibarra,* 147 P.3d at 847–48 (citing *State v. MacDonald,* 253 Kan. 320, 856 P.2d 116, 120 (1993) (odor of marijuana constitutes probable cause to support a warrantless search); *State v. Bickerstaff,* 26 Kan.App.2d 423, 988 P.2d 285, 286 (1999) (odor of alcohol, breath test, and denial of drinking constitute probable cause for warrantless search of a vehicle)). After determining that the exigent circumstances exception to the warrant clause did not apply, *Ibarra,* 147 P.3d at 849, the Court distinguished the odor of ether from the odor of marijuana or other contraband.

> [T]he odor of marijuana, an illegal substance, can provide probable cause standing alone.... It is not surprising then that the odor of marijuana combined with an anonymous tip can furnish probable cause. In the present case, the ether smelled by the officers is not an illegal substance and we

decline to conclude that the odor of ether alone could establish probable cause for the search of Ibarra's vehicle. Where the odor alone does not furnish probable cause, this court should not use it to bootstrap insubstantial information in to establish probable cause.

*Ibarra*, 147 P.3d at 856. The odor of ether is distinguishable from the odor of contraband like marijuana because "[t]he strong odor of ether . . . is as consistent with lawful activity as it is with criminal activity." *Ibarra*, 147 P.3d at 850. Thus, "the smell of ether alone is justification for further investigation but not for a search." *Id.*

We disagree with the State's interpretation of the cases it cites in support of the proposition that the odor of ether alone is sufficient to establish probable cause. The State cites *United States v. Clayton*, 210 F.3d 841, 842 (8th Cir.2000), in which police, acting on an anonymous tip about a methamphetamine laboratory and illegal guns, went to Clayton's home to execute an arrest warrant on an unrelated matter. Upon arriving at the home, the officers smelled odors related to the manufacture of methamphetamine and saw jars of liquid that the officers believed to be methamphetamine. *Clayton*, 210 F.3d at 842–43. Although the officers had no search warrant, Clayton consented to the search. *Clayton*, 210 F.3d at 843. The Court of Appeals for the Eighth Circuit upheld the validity of the search, holding that the officers validly entered Clayton's home to execute an unrelated arrest warrant, and that the odor and other items were in "plain view" upon entry. *Clayton*, 210 F.3d at 844–45. In that case, the police relied not only on the odor of chemicals associated with methamphetamine manufacture in seeking a search warrant, but also the corroborating tip about methamphetamine manufacture and the presence of liquids that appeared to be methamphetamine.

Similarly, in *State v. Kennedy*, 953 So.2d 655, 656 (Fla.Dist. Ct.App.2007), police received information that Kennedy was involved in a feud over stolen anhydrous ammonia to be used in the manufacture of methamphetamine. Acting on this information, police went to Kennedy's home to investigate the possibility of methamphetamine manufacture. *Id.* From out-

side the home, police smelled the odors of anhydrous ammonia and ether, which the officer "knew were consistent with the manufacture of methamphetamine. Based on these odors, the task force leader arrested [Kennedy] as soon as [Kennedy] opened the front door." *Id.* On a subsequent "protective sweep" of the home, officers found a methamphetamine laboratory. *Id.* The Court of Appeals of Florida, First District, reversed the lower court's decision to suppress the evidence recovered from the home, noting that "[w]hen the lead officer smelled the odors of anhydrous ammonia and ether, which he knew were consistent with the manufacture of methamphetamine, probable cause existed to arrest [Kennedy]." [12] *Kennedy,* 953 So.2d at 657. Not unlike *Clayton,* 210 F.3d at 844–45, *Kennedy* is distinguishable from the present facts because the corroborating tip about methamphetamine manufacturing in the home provided a context that supported the officer's belief that the odor of lawful substances was associated with criminal activity.

The State also relies on *Minnick v. United States,* 607 A.2d 519 (D.C.1992). In *Minnick,* police officers stopped Minnick's car for a traffic violation in an area known for PCP trafficking. *Minnick,* 607 A.2d at 521. During the stop, the officers "smelled a strong odor of PCP emanating from inside the car." *Id.* A search of Minnick's purse uncovered two vials of PCP. *Id.* The District of Columbia Court of Appeals held that "the search . . . was justified by the strong, distinctive odor of PCP which both detectives smelled as they approached Minnick's car," and accordingly held that the search did not violate the Fourth Amendment. *Minnick,* 607 A.2d at 525. Unlike marijuana, which has a readily identifiable, distinctive odor, it is unclear from the case law or the record in the present case

---

**12.** Interestingly, Kennedy did not dispute that the odors of anhydrous ammonia and ether, combined with the information known to law enforcement, constituted probable cause for his arrest. *State v. Kennedy,* 953 So.2d 655, 657 (Fla.Dist.Ct.App.2007). Instead, Kennedy's only argument was that "law enforcement officers went on to his property without either a warrant or 'exigent circumstances.' " *Kennedy,* 953 So.2d at 656.

whether PCP has its own distinctive odor when it is transported or consumed, or whether the odor is that of other substances allegedly associated with the drug, such as ether. We cannot determine whether the odor discussed in *Minnick* is the same odor of ether that Officer Lewis detected when he encountered the petitioner. The court's conclusion in *Minnick*, however, was not only supported by the odor of PCP, but also on the officer's knowledge that the area in question was specifically known for PCP trafficking.[13] Moreover, the record in the present case is barren of information about the qualities of PCP odors. There is no information in the record indicating whether the odor of PCP may have different qualities, similar to the distinction between the odor of burning marijuana and raw marijuana. *See Wilson v. State*, 174 Md.App. 434, 454–55, 921 A.2d 881, 892 (2007) (discussing the distinction between raw and burnt marijuana odors in a probable cause analysis).

---

**13.** The State also relies on a similar case, *United States v. Fattaleh*, 746 F.Supp. 599, 600 (D.Md.1990), in which a police officer lawfully stopped Fattaleh for speeding. During the course of the stop, the officer noticed an "acrid" odor that, based on his law enforcement experience, he identified as "the type [of odor] which emanates from this drug [PCP]." *Id.* Based on the odor, the officer searched Fattaleh's vehicle and found two "dippers," or cigarettes dipped in liquid PCP. *Id.* The United States District Court for the District of Maryland held that "the smell of PCP established the probable cause to search the car" and, accordingly, upheld the validity of the search. *Fattaleh*, 746 F.Supp. at 602. Like in *Minnick v. United States*, 607 A.2d 519 (D.C.1992), we are unable to determine whether the odor discussed in *Fattaleh* is an odor distinctive to the contraband itself or the odor of a substance allegedly associated with PCP, such as ether. For example, in *People v. Darby*, 263 A.D.2d 112, 701 N.Y.S.2d 395, 396–97 (N.Y.App. Div.2000), a defense expert testified that unadulterated PCP has no smell, but a police officer testified that the street drug, which is not unadulterated, has a distinctive smell. The officer, in *Darby*, did not mention the word ether. To assume that the odors discussed in *Minnick* and *Fattaleh* are the same as the odor of ether in the present case requires more than an inference or a presumption. It would be tantamount to judicial notice, which we refrain to do. Because we cannot determine whether the odor in *Fattaleh* is that of the contraband itself or of a lawful substance allegedly associated with contraband, the District Court's analysis is not persuasive. The District Court's analysis, in any event, is not binding on this Court.

We are unaware of any cases in which a court held that the smell of ether or another lawful substance associated with contraband, on its own, constituted probable cause for a belief that contraband was present or a crime was committed.[14] To the contrary, several courts have take the same position as the Supreme Court of Kansas in *Ibarra,* 282 Kan. 530, 147 P.3d 842, discussed *supra,* holding that the odor of a lawful substance, on its own, does not constitute probable cause for a belief that contraband is present or a crime has been committed, even if the lawful substance is allegedly associated with contraband. *United States v. Matteucci,* 842 F.Supp. 442, 447 (D.Or.1994) (holding that smell of items used in methamphetamine manufacture does not constitute probable cause on its own for a warrantless search under the automobile exception); *People v. Dickson,* 144 Cal.App.3d 1046, 192 Cal.Rptr. 897, 903–04 (1983) (holding that the odor of ether, one of many chemical ingredients required in the manufacture of methamphetamine, will not constitute probable cause for a warrantless entry); *Ibarra,* 147 P.3d at 850 (holding that the strong odor of ether alone, even without an explanation, does not constitute probable cause for a warrantless vehicle search because the "odor of ether is as consistent with lawful activity as it is with criminal activity"); *cf. State v. Mahsman,* 157 S.W.3d 245, 253 (Mo.App.2004) (holding that "odd behavior while in lawful possession of guns and ether does not, without more, suggest drug use or provide probable cause to support a search warrant for drugs"); *see also United States v. Tate,* 694 F.2d 1217, 1224 (9th Cir.1982), *vacated,* 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 873 (1984) ("smell of a non-contraband

**14.** The state relies on *Kleinholz v. United States,* 339 F.3d 674, 677 (8th Cir.2003) in which the United States Court of Appeals for the Eighth Circuit noted in dicta that "[t]he smell of ether might alone support a finding of probable cause." *Id.* (citing *United States v. Clayton,* 210 F.3d 841, 845 (8th Cir.2000)). The Court, however, did not rely on this proposition in making its determination. The probable cause determination was also supported by other corroborating facts, such as an anonymous tip about Kleinholz's involvement in methamphetamine manufacturing and the arrest of his cohorts outside his home for possession of narcotics. *Kleinholz,* 339 F.3d at 676–77. Thus, we do not find the Court of Appeals' dicta persuasive.

substance having a number of legitimate uses, standing alone, does not establish probable cause to search a residence").

■■■ As this Court recently noted in *Crosby*, 408 Md. at 512, 970 A.2d at 907, "it is 'impossible for wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.' " *Id.* (quoting *United States v. Wood*, 106 F.3d 942, 948 (10th Cir.1997) (internal citations omitted)). The odor of ether is an innocent factor without context, but the totality of the circumstances may lead to a conclusion that the lawful substance is associated with a criminal purpose. *See Crosby*, 408 Md. at 508, 970 A.2d at 904 ("[C]ontext matters: actions that may appear innocuous at a certain time or in a certain place might very well serve as a harbinger of criminal activity under different circumstances." (quoting *United States v. Branch*, 537 F.3d 328, 336 (4th Cir.2008))). In the cases in which courts held that the odor of ether or another lawful substance constituted probable cause for a belief that contraband or criminal activity were present, the surrounding circumstances strongly suggested that the odor was associated with criminal activity.

In the cases discussed *infra*, courts have held that the odor of ether or other non-contraband substances constituted probable cause when the suspicion of criminal activity was corroborated by other circumstantial evidence of criminal activity, such as a tip providing specific information about drug manufacture, or specific knowledge that an area is known for the distribution of the contraband associated with the odor. *See Clayton*, 210 F.3d at 844–45 (odor of ether, tip about methamphetamine manufacture); *Minnick*, 607 A.2d at 524–25 (odor of PCP, area known for PCP distribution); *Kennedy*, 953 So.2d at 656–57 (odor of ether and ammonia, tip about methamphetamine manufacture). Other courts have relied on similar factors in determining that the odor of ether, combined with other factors, constituted probable cause. *See Fouse v. State*, 73 Ark. App. 134, 43 S.W.3d 158, 166 (2001) (odor of ether, informant information, counter-surveillance measures

taken while home was under surveillance). The other factors cited by courts include the presence of drug paraphernalia, the presence of other items used in the manufacture of contraband, and suspicious statements of the suspects. *See State v. Nitcher*, 720 N.W.2d 547, 555 (Iowa 2006) (odor of ether, shuffling inside a garage, suspect denied an obvious chemical odor); *State v. Ulrey*, 41 Kan.App.2d 1052, 208 P.3d 317, 324 (2009) (jug, box of salt, and kitchen strainer, all items used in the manufacture of methamphetamine, combined with odor of anhydrous ammonia); *Hollis v. State*, 219 S.W.3d 446, 460 (Tex.App.2007) (odor of ether emanating from abandoned building, scale, tubing, drug paraphernalia, jars of liquid, white powder). In all of the aforementioned cases, the surrounding circumstances provided other factors, in addition to the odor of ether, that led to a reasonable conclusion that the defendant was involved in criminal activity.

In the present case, the totality of the circumstances do not provide a concrete reason to associate the odor of ether with criminal activity or contraband. In reaching its decision that Officer Lewis had reasonable articulable suspicion to approach the petitioner, a lesser standard than probable cause, the Circuit Court relied on the odor of ether, the fact that the petitioner was in a high drug crime area and standing "well in the shadows," and the petitioner's failure to respond to Officer Lewis's questions. The Circuit Court did not rely on the petitioner's glossy eyes, nor did the court make a factual finding as to whether Officer Lewis observed the petitioner's eyes before he seized the petitioner. Moreover, Officer Lewis's testimony did not indicate whether he observed the petitioner's glossy eyes before or after initially seizing the petitioner. Further, Officer Lewis did not elaborate on the definition of "glossy" or how glossiness would tend to show intoxication. Thus, we shall not consider the petitioner's allegedly glossy eyes in our probable cause analysis.

The Circuit Court gave "great weight" to the fact that the petitioner was standing in a high drug crime area, where the police had received "a number of complaints from citizens." Certainly, the fact that activity is taking place in a high drug

crime area can inform the police officer's analysis about the nature of activity taking place. *See, e.g., United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 751, 151 L.Ed.2d 740, 750 (2002) (conduct that might be innocent in its own way may be suspicious under other circumstances). In the present case, however, the petitioner's presence in a high drug crime area does not provide a suspicious context for his otherwise innocuous actions, mainly because the petitioner was not engaged in any particular activity. According to Officer Lewis's testimony, the petitioner was not crouching behind anything, standing behind an object, or peering through windows, he was merely standing along the side of a house next to a parking lot. Further, there is no indication that the petitioner was engaging in any behavior that would suggest that he was ingesting PCP, such as smoking what appeared to be a cigarette or attempting to extinguish or hide a smoking device. Additionally, the testimony about the high drug crime area did not provide any specific information that would support a conclusion that the petitioner was involved in criminal activity. Unlike in *Minnick*, 607 A.2d at 520, where the area in question was known for PCP trafficking, in the present case there were no specific complaints about PCP, the petitioner, or about drug activity in the area on the night in question. Rather, the testimony indicated that there were general complaints about criminal or drug activity in the area, of unknown frequency, made at unknown points in time. We are mindful of this Court's warning in *Ransome v. State*, 373 Md. 99, 111, 816 A.2d 901, 908 (2003):

> If the police can stop and frisk any man found on the street at night in a high-crime area merely because he has a bulge in his pocket, stops to look at an unmarked car containing three ununiformed men, and then, when those men alight suddenly from the car and approach the citizen, acts nervously, there would, indeed, be little Fourth Amendment protection left for those men who live in or have occasion to visit high-crime areas.

*Id.* (holding that there was no reasonable basis for a frisk because "petitioner had done nothing to attract police atten-

tion other than being on the street with a bulge in his pocket").

We are equally hesitant to determine that the petitioner's failure to answer Officer Lewis's questions has any significance, in a probable cause determination, in the absence of further facts suggesting a suspicious or criminal element to his silence. Officer Lewis testified that he interpreted the defendant's silence as evidence of intoxication:

> Q [State's Attorney]: ... What are some of the general characteristics of an individual under the influence of phencyclidine?
>
> A [Officer Lewis]: Normally, they possess various strengths, *sometimes they could be incoherent in reference to trying to understand if someone is saying something to them....*
>
> ...
>
> Q: Other than the defendant having glassy eyes, are there any other characteristics that the defendant had on the night that you came into contact with him that would be reminiscent of someone under the influence of phencyclidine?
>
> A: No response once I was asking him questions.... When I asked the defendant a question, I got no response from him.

(Emphasis added.) Although Officer Lewis does not say so directly, the inference appears to be that when the petitioner did not answer the question twice posed to him, his failure to respond was due to incoherence or an inability to comprehend the question due to intoxication. The Circuit Court did not make a factual finding about whether the court interpreted the petitioner's silence as evidence of intoxication. Rather, the court noted that the petitioner's failure to respond "[gave] Officer Lewis reason to approach the defendant and the right to determine the individual's name and address."

Although the State is entitled to the benefit of any reasonable inferences from the evidence adduced at the suppression hearing, in our view, it is not reasonable to infer that the

petitioner's silence suggested intoxication. "In a probable cause determination, 'the experience and special knowledge of the police officers who are [attempting to establish probable cause] are among the facts which may be considered.' The observations of the police, however, must be based on something factual." *Longshore*, 399 Md. at 534, 924 A.2d at 1157 (quoting *Wood v. State*, 185 Md. 280, 286, 44 A.2d 859, 861 (1945)) (noting that "while the police did see two men enter a car and one man stand outside the car, the videotape did not reveal any actual hand to hand transfer, money transfer, or drug paraphernalia transfer" when holding that the behavior on the videotape did not reflect drug activity). Here, no facts were presented to distinguish the petitioner's supposedly intoxication-based silence from a decision by the petitioner to invoke his Constitutional right to ignore Officer Lewis's questions. *See Terry v. Ohio*, 392 U.S. at 34, 88 S.Ct. at 1886, 20 L.Ed.2d at 913 (White, J. concurring). This Court has previously held that "[the] petitioner's silence when the officer accosted him ... [did not provide] the officer with sufficient probable cause to arrest him." *Wilson v. State*, 409 Md. at 441–42, 975 A.2d at 892 (no probable cause to seize an individual who was lying on the side of a roadway at 5:00 A.M., had abrasions on his face and knuckles, and failed to respond to police inquiries); *see also Grier*, 351 Md. at 252, 718 A.2d at 217 ("[I]n most circumstances silence is so ambiguous that it is of little probative force.") (quoting *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975)). Essentially, the petitioner was standing next to a house in a residential area, not doing anything in particular, with the odor of ether emanating from his person, when he failed to respond to police questioning for reasons unknown to the officer. Based on these facts, the totality of the circumstances does not support the conclusion that Officer Lewis had probable cause to arrest the petitioner.

 "[A] search conducted without a warrant supported by probable cause is *per se* unreasonable under the Fourth Amendment, subject to only a few exceptions." *Belote*, 411 Md. at 112, 981 A.2d at 1252 (quoting *Cherry v. State*,

86 Md.App. 234, 240, 586 A.2d 70, 73 (1991)). A search incident to a lawful arrest is a well-established exception to the warrant requirement. *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427, 434 (1973); *Chimel v. California,* 395 U.S. 752, 759, 89 S.Ct. 2034, 2038, 23 L.Ed.2d 685, 692 (1969). "It is axiomatic that when the State seeks to justify a warrantless search incident to arrest, it must show that the arrest was lawfully made prior to the search." *Bouldin,* 276 Md. at 515, 350 A.2d at 132–33 (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Preston v. United States,* 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964)). Thus, because Officer Lewis did not make a lawful arrest when he seized the petitioner, the subsequent warrantless search of the petitioner was not within an exception to the warrant requirement and therefore violated the Fourth Amendment.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY. PRINCE GEORGE'S COUNTY TO PAY THE COSTS.**

HARRELL, J., files a dissenting opinion in which BARBERA, J., joins.

Dissenting Opinion by HARRELL, Judge, which BARBERA, J., Joins.

I doubt that anyone who sat on this case, whether on this Court or any court through which it passed, could identify the smell of ether before now, if at all.[1,2] To his credit and

---

**1.** The term "ether" describes, in reality, not a single chemical or compound, but an entire class of organic chemical compounds, each with different compositions, but sharing certain characteristics.

**2.** Some of the roles of ether in the drug culture have been noted in popular literary works. Recreational use of diethyl ether was portrayed in the novel *Fear and Loathing in Las Vegas: A Savage Journey to the Heart of the American Dream* by Hunter S. Thompson (Random House

training,[3] Officer Lewis at least appreciated the odor of ether present and emanating from Bailey [4] and associated it with a role in the life cycle of a specific illicit drug, PCP.[5]

---

1971, at 43), who compared its effects to the behavior of a "village drunkard in some early Irish novel." It also was portrayed in the novel *The Cider House Rules* by John Irving (William Morrow 1985) and in the film adaptation of the same name.

3. The State developed on direct examination during the suppression hearing Officer Lewis' basis to recognize the smell of ether and an association of ether with PCP:

Q. Now, officer, you said that you smelled a strong odor of ether; is that correct?

A. Yes, ma'am.

Q. Have you ever come in contact, during your five and a half years with the Prince George's County Police Department, with phencyclidine?

A. Yes, ma'am.

Q. Does phencyclidine have an odor?

A. An odor of ether.

Q. How many times have you come into contact with phencyclidine?

A. Hundreds.

Q. How many arrests have you made where phencyclidine was present?

A. Hundreds.

Q. Have you had any training during your five and a half years with respect to the odor and appearance of phencyclidine?

A. I have, ma'am.

Q. Can you detail that for Your Honor?

A. I received training in basic schools, the academy, and also follow-up classes, investigative classes, which were drug related after graduating from the academy.

4. In direct examination, Officer Lewis stated:

Q. And the odor of ether that you smelled, you indicated that was about the defendant's person, correct?

A. Yes, correct.

Q. Approximately, how far away from the defendant were you when you smelled this odor of ether?

A. Maybe just a few f[ee]t. I was able to reach out and touch him.

5. The cases recognize at least two main roles that ether plays in the life cycle of PCP: (1) as a precipitating agent in the manufacturing of PCP—*see Porter v. Terhune*, 2006 U.S. Dist. Lexis 96690 at \*20 (C.D.Cal. March 1, 2006); and (2) as an evaporating agent in the preparation of cigarettes laced with PCP—*see U.S. v. Dorsey*, 921 F.2d 785, 788 (8th Cir.1990); *U.S. v. Brown*, 871 F.2d 80, 81 (8th Cir.1989).

The smell of ether has been described as a "unique and pungent aroma ... associated with PCP," *People v. Luna,* 140 Cal.App.3d 788, 790, 189 Cal.Rptr. 792 (2nd Dist., 1983), a "sweet, chemical ... smell," *U.S. v. Rivera,* 867 F.2d 1261, 1262 (10th Cir.1989), and "a distinct, if not 'peculiar' smell," *State v. Fisher,* 283 Kan. 272, 154 P.3d 455, 480 (2007).

Confronting that recognizable odor and drug association emanating from Bailey as he stood, glassy-eyed[6] and unre-

---

**6.** The Majority opinion makes much of an obvious typographical error in the transcription of the suppression hearing testimony. During direct examination, Officer Lewis explained as follows:

Q. Have you, during the course [of] your employment, come into contact with individuals under the influence of phencyclidine?
A. Yes, I have.
Q. Approximately, how many times?
A. Hundreds.
Q. During those hundreds of times that you've come into contact with those individuals, are they characteristics that are similar to those individuals who are under the influence of phencyclidine?
A. Yes. It varies from person to person.
Q. Okay. What are some of the general characteristics of a an individual under the influence of phencyclidine?
A. Normally, they possess various strengths, sometimes they could be incoherent in reference to trying to understand if someone is saying something to them, and very *glossy* eyes, which the defendant had at the time.

(Emphasis added.) The next question posed by the prosecutor was as follows:

Q. Other than the defendant having *glassy* eyes, are there any other characteristics that the defendant had on the night that you came into contact with him that would be reminiscent of someone under the influence of phencyclidine?
A. No response once I was asking him questions.
THE COURT: I'm sorry. No response to what?
THE WITNESS: When I asked the defendant a question, I got no response from him.
BY MS. STEUART:
Q. Other than asking the defendant whether he lived where he was standing, do you recall asking him anything else?
A. No, ma'am.

(Emphasis added.)

It is clear to me that the prosecutor heard Officer Lewis say "glassy," not "glossy," initially and his follow up question was framed accordingly. As to when in the confrontation Lewis noticed Bailey's glassy eyes, the State's evidence (because it was the prevailing party below) is entitled to a reasonable inference that Lewis noted the quality of Bailey's eyes contemporaneously with detecting the odor of ether and

sponsive, at 11:35 p.m. in the shadows alongside a townhouse in a known high drug activity area, Officer Lewis, in my opinion, had probable cause to support a warrantless arrest of Bailey and the resultant search incident of his person. The only things that could have undermined that probable cause might have been had Bailey been dressed in a hospital gown (suggesting the smell of ether may have been incident to the administration of an archaic form of anesthesia to facilitate medical treatment) [7] or a maid's outfit (suggesting that he had been or was in the act of applying household aerosol cleaners or solvents to the interior or exterior of the townhouse). Neither hypothetical appears to be apt to the actual circumstances attested by Officer Lewis.

The Majority opinion attempts to bolster its unrealistic analysis by characterizing Bailey's condition and circumstances as merely a series of innocuous coincidences, all benign in and of themselves (when considered separately or in isolation), amounting to no reason(s) for Officer Lewis to think something illicit was afoot. Although paying lip service to a totality of the circumstances analysis, the Majority opinion actually employs a divide-and-conquer consideration of some, but not all, of the factors available to Officer Lewis on the night in question. That is an incorrect analytical approach. *See United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 751, 151 L.Ed.2d 740, 750 (2002) (citing *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). In a similar vein, the Majority opinion attempts, by mis-characterizing the State's case here as solely premised on the odor of ether, to distinguish the many cases where the smell of ether, coupled with other indicia of suspicious activity or circumstances, was found to supply probable cause. The record

---

Bailey's unresponsiveness to questioning. The inference derives from the proximity of the two of them at the time Lewis smelled the ether and the common sense notion that Lewis likely looked at Bailey's face at the same time.

7. Ether rarely is used any longer in developed countries as an anesthesia because of its flammability and the ready availability of nonflammable alternatives.

here, however, reviewed in a light most favorable to the State as the prevailing party below, revealed much more than the mere smell of ether:

- prior citizen complaints about the particular area experiencing high illegal drug activity;

- Bailey was standing in the shadows of the side of the townhouse at 11:35 p.m.;

- he did not respond at all to Officer Lewis' questions whether Bailey lived in the townhouse;

- his eyes were glassy; and

- he reeked of ether.

These factors, coupled with Lewis' training that enabled him to discern the singular smell of ether and his knowledge regarding a relationship between ether and PCP, were ample cause to arrest Bailey and search his person. To conclude otherwise is to overlook the relevant principle that courts should respect an officer's ability to draw on his or her own experience and training to draw inferences and deductions from the cumulative information available to him or her that "might well elude an untrained person." *Arvizu,* 534 U.S. at 273, 122 S.Ct. at 750–51, 151 L.Ed.2d at 749–50 (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)).

I have no problem affirming the judgments of the Court of Special Appeals and the Circuit Court for Prince George's County.

Judge BARBERA has authorized me to state that she joins in this dissenting opinion.