People v Fudge (2021 NY Slip Op 04801)





People v Fudge


2021 NY Slip Op 04801


Decided on August 26, 2021


Appellate Division, Fourth Department


NeMoyer, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 26, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., CARNI, NEMOYER, WINSLOW, AND BANNISTER, JJ.


229 KA 18-02388

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
ANTHONY FUDGE, DEFENDANT-APPELLANT. 






FRANK H. HISCOCK LEGAL AID SOCIETY, SYRACUSE (KRISTEN N. MCDERMOTT OF COUNSEL), FOR DEFENDANT-APPELLANT.
WILLIAM J. FITZPATRICK, DISTRICT ATTORNEY, SYRACUSE (JESSICA N. CARBONE OF COUNSEL), FOR RESPONDENT. 


NeMoyer
 Appeal from a judgment of the Supreme Court, Onondaga County (Gordon J. Cuffy, A.J.), rendered August 10, 2018. The judgment convicted defendant, upon his plea of guilty, of criminal possession of a controlled substance in the fourth degree. 
It is hereby ORDERED that the judgment so appealed from is unanimously affirmed.
Opinion by NeMoyer, J.:
The olfactory detection of street-level PCP by a trained and experienced police officer constituted probable cause to search defendant's car. Supreme Court thus properly refused to suppress the cocaine discovered during that search.
FACTS
On August 31, 2017, police officers Dorchester and Brown were patrolling a high-crime area in the City of Syracuse when they noticed an illegally-parked car. The officers approached the vehicle, which had three occupants; defendant was in the driver's seat. "[A]s soon as I walked up to the vehicle," Dorchester testified, "I could smell a really strong chemical odor that was familiar to myself as PCP." Dorchester had received PCP training at the police academy; he regularly received updated training on PCP and other drugs; and he had encountered PCP and its distinctive smell "hundreds" of times over the course of his career as a police officer. Based on his training and experience, Dorchester testified, he immediately recognized the odor emanating from defendant's vehicle as PCP. When pressed on whether he could have been smelling something else, Dorchester held firm: the smell of PCP, he explained, was "pretty distinct."
The officers asked defendant for his name, but he stuttered and hesitated, and he ultimately provided a fake name. According to Dorchester, defendant's eyes were glossy, his speech was slurred, and he was clearly under the influence of something. The officers therefore directed defendant to exit the vehicle. As defendant began to do so, Brown saw him make a sweeping gesture with his right hand toward the center console and the front-seat passenger; in Brown's experience, such a gesture was often deployed to discard or obscure illegal items. After defendant got out, the officers searched the vehicle and discovered a clear plastic bag containing a beige, chunky substance, which field-tested positive as cocaine. Defendant then waived his Miranda rights and confessed to possessing the cocaine. Notably, PCP-dipped cigarettes were discovered in the possession of the rear, driver-side passenger.
Defendant was thereafter indicted for, inter alia, criminal possession of a controlled substance in the fourth degree in connection with the cocaine. Following a hearing at which Dorchester and Brown testified as indicated above, the court, inter alia, refused to suppress the [*2]cocaine [FN1]. In its written decision, the court initially found that both officers had testified credibly at the suppression hearing. The court then held that the parking violation gave the officers an objective, credible reason for approaching defendant's vehicle in the first instance, and "[o]nce Officer Dorchester smelled what he recognized, in his training and experience, to be the distinct odor of PCP, he had probable cause to . . . search the [vehicle]" in which the cocaine was discovered.
Defendant thereafter pleaded guilty to criminal possession of a controlled substance in the fourth degree (Penal Law § 220.09 [1]) and was sentenced, as promised, to a determinate term of 4 years' imprisonment and 2 years' postrelease supervision (PRS). Defendant did not waive his right to appeal as part of the plea bargain. Defendant appeals, and we now affirm.
DISCUSSION
Defendant primarily challenges the court's refusal to suppress the cocaine. Given the undisputed parking infraction, defendant concedes — as he must — that the police validly approached his car in the first instance. He nevertheless insists, at great length, that the subsequent search of his vehicle was impermissible. For the reasons that follow, we reject defendant's arguments on the merits. And perhaps more importantly, we reprove the tactics that his lawyer used in making those arguments.
I
Defendant first argues that probable cause may never arise solely from a trained officer's detection of the smell of street-level PCP. Defendant is wrong.
A
Law enforcement "may search a vehicle without a warrant when they have probable cause to believe that evidence or contraband will be found there" (People v Galak, 81 NY2d 463, 467 [1993]; see People v Blasich, 73 NY2d 673, 678 [1989]; People v Thomas, 181 AD3d 831, 833 [2d Dept 2020], lv denied 36 NY3d 976 [2020]). Probable cause exists when, "[b]ased on the articulated, objective facts . . . and the reasonable inferences to be drawn therefrom, it was 'more probable than not' that criminal activity was taking place" (People v Mercado, 68 NY2d 874, 877 [1986], cert denied 479 US 1095 [1987], quoting People v Carrasquillo, 54 NY2d 248, 254 [1981]; see People v Ray, 159 AD3d 1429, 1429-1430 [4th Dept 2018], lv denied 31 NY3d 1086 [2018]).
The First Department, in a full signed opinion, applied this rule in circumstances virtually identical to those at bar (see People v Darby, 263 AD2d 112 [1st Dept 2000] [Saxe, J.], lv denied 95 NY2d 795 [2000]). In Darby, the "officers testified at the suppression hearing that when they were several feet from defendant, they detected the very strong smell invariably associated with street-level phencyclidine (PCP) wafting from him. They explained that in their training at the Police Academy, and in the course of approximately 50 prior arrests for PCP possession or sale, they have learned to recognize the distinctive odor" (id. at 113). Reversing the suppression order, the First Department held that the officers' testimony regarding "[t]he distinctiveness of the [PCP] odor was enough, when combined with the officers' other observations and knowledge, to give [them] probable cause for stopping and searching defendant" (id. at 114).
Darby is not the only case in which a New York court found probable cause based exclusively on a trained officer's olfactory detection of PCP. More recently, the First Department cited Darby in holding that the police had "obtained probable cause to search [a] car upon detection of a strong odor . . . indicative of street level phencyclidine (PCP)" (Sanchez v City of New York, 168 AD3d 584, 585 [1st Dept 2019]). Various trial courts, also citing Darby, have likewise refused to suppress drugs when the underlying search was predicated solely on the officer's olfactory detection of PCP. As one trial judge wrote, "PCP has been recognized to have a distinct odor . . . and the smell of this distinct odor, combined with the training and experience [*3]of the police officer smelling it, is sufficient probable cause . . . for the [warrantless] search of [a] vehicle" (People v Gambino, 42 Misc 3d 1216[A], 2014 NY Slip Op 50049[U], *2-3 [NYC Crim Ct, Richmond County 2014]; accord People v Vester, 60 Misc 3d 1202[A], 2018 NY Slip Op 50901[U], *2 [Mount Vernon City Ct 2018]).
New York is no outlier on this issue. Indeed, as far as we can discern, every single court in the United States to ever consider this precise issue has come to the same conclusion as Darby and Sanchez: a trained officer's olfactory detection of PCP, standing alone, constitutes probable cause. Take, for example, this strong pronouncement from the Court of Appeals of the District of Columbia:
"The question for this court is an easy one: did Detective Keenan have probable cause to believe that drugs were to be found inside [defendant's] car? The odor of PCP noticed by both detectives provides a clear answer to that question . . . [T]he search in this case was justified by the strong, distinctive odor of PCP which both detectives smelled as they approached [defendant's] car" (Minnick v United States, 607 A2d 519, 525 [DC 1992]).
Our research has uncovered scores of similar rulings from courts across the country (see e.g. United States v Glover, 681 F3d 411, 418 [DC Cir 2012] [Kavanaugh, J.], cert denied 568 US 995 [2012] [officer's detection of PCP smell emanating from a home was sufficient probable cause to obtain a search warrant]; United States v Hubert, 48 Fed Appx 481, 481 [5th Cir 2002], cert denied 537 US 1146 [2003] ["officers detected the distinctive and unmistakable smell of PCP in [defendant's] vehicle, which provided the probable cause necessary to search the entire vehicle"]; United States v Smith, 373 F Supp 3d 223, 242 [D DC 2019] ["a distinctive odor of PCP, alone, can establish probable cause to search the place from which the smell is emanating"]; United States v Fattaleh, 746 F Supp 599, 601 [D Md 1990] ["officer . . . smelled the odor of PCP emanating from [defendant's] car and, therefore, had probable cause to search the vehicle"]; Hall v State, 981 A2d 1106, 1114 [Del 2009] ["The strong odor of PCP establishes probable cause to believe the vehicle occupied by [defendant] contained evidence of criminal activity. Thus, the warrantless search of [that vehicle] was proper."]; Commonwealth v Cottman, 2018 WL 4624262, *3 [Penn Super 2018], appeal denied 651 Pa 570 [2019] ["the odor of PCP . . . provided the police officer with . . . probable cause"]; State v Groomes, 2016 WL 1562754, *5 [NJ App Div 2016], certif denied 227 NJ 260 [2016] ["The odor of PCP also . . . satisf[ied] probable cause"]; State v Friday, 2016 WL 7337494, *10 [Md Spec App 2016] ["The odor of PCP alone gave rise to probable cause"]; Horton v State, 2016 WL 1644486, *3 [Tex App 2016], cert denied — US &mdash, 137 S Ct 1378 [2017]).
In light of the foregoing, it is astoundingly inaccurate for defendant's brief to assert that "[t]his is a case of first impression." Moreover, the representation in defendant's brief that "none of the Appellate Divisions . . . has ever passed upon the question of whether the smell of PCP may, standing alone, constitute probable cause to search" is an unacceptable dereliction of counsel's duty of candor to our Court, for the First Department has done precisely that in two separate cases (Darby and Sanchez). And given that Sanchez involved a car search, the statement in defendant's brief that "no appellate case law from this state . . . has approved the search of a vehicle based solely on the smell of PCP" is yet another misrepresentation of the caselaw. We take this opportunity to echo the First Department's monition that "counsel has an obligation to bring adverse authority to [our] attention" (Matter of Tri Messine Constr. Co. v Martinez, 15 AD3d 283, 284 [1st Dept 2005]; see Matter of Isabella City Carting Corp. v Martinez, 15 AD3d 281, 282 [1st Dept 2005]; Nachbaur v American Tr. Ins. Co., 300 AD2d 74, 76 [1st Dept 2002], lv dismissed 99 NY2d 576 [2003], cert denied 538 US 987 [2003]).
B
Instead of acknowledging the weight of the unfavorable precedent, defendant's brief ignores Sanchez's holding altogether, and it mounts a disingenuous and unconvincing campaign to distinguish Darby. To the latter point, defendant's brief insists that Darby stands only for the proposition that "the smell of PCP contributed to a finding of probable cause" in that case, and that the predominant ingredient in that stew of probable cause actually came from the officers' visual observations of the defendant's drug-dealing activities in the moments before they approached him. To explicate his reading of Darby, defendant's brief (on page 11) quotes [*4]certain language from page 115 of that opinion that would, on its face, appear to support his position.
Defendant's reading of Darby is fatally flawed, however, because the language that he quotes on page 11 of his brief actually comes from Justice Rosenberger's dissenting opinion, not from Justice Saxe's majority opinion. Nowhere did the majority in Darby identify, much less rely upon, the visual indicia of drug dealing that the dissent noted and that defendant now offers as the true basis of Darby's holding. Quite the contrary, the only salient facts mentioned by the majority were the officers' testimony, observations, and experience about PCP and its distinct odor, not about any visual indicia of drug dealing (Darby, 263 AD2d at 113-114). And most decisively, the majority in Darby summarized its holding at the end of the opinion in the following terms: "the hearing court lacked a valid basis for its rejection of the officers' testimony that they smelled the distinctive odor of PCP. Once the officers' testimony is accepted in this respect, probable cause for the challenged search has been successfully established, and suppression must be denied" (id. at 114 [emphasis added]). With that language, the majority in Darby could not have been clearer that it was upholding the search based exclusively on the smell of street-level PCP and the officers' ancillary observations and knowledge about the smell of street-level PCP [FN2].
In light of the foregoing, we cannot countenance defendant's suggestion that the majority's holding in Darby was actually underpinned not by what it wrote, but rather by a host of facts that it never mentioned. And worst of all, defendant failed to inform us that the language he quoted on page 11 of his brief came from the dissent in Darby, rather than from its majority.
Parenthetically, it is worth pointing out that this defendant would not prevail even under the dissenting rationale in Darby. In his dissent, Justice Rosenberger argued only that the Appellate Division should have deferred to the motion court's negative credibility finding with respect to the officers' testimony, and that probable cause was necessarily lacking after that testimony was discounted (id. at 116-117 [Rosenberger, J.P., dissenting]). The dissent in Darby did not argue that the police testimony in that case was incredible as a matter of law; rather, the dissent would have simply hewed to the Appellate Division's general disinclination to disturb a trial judge's credibility finding on a contested point. Nor did the dissent in Darby argue that suppression would have been warranted even had the police testimony been properly credited. There is thus no indication that the dissenters in Darby would have granted suppression where the motion court specifically and properly credits police testimony about smelling PCP, and given the motion court's positive credibility determination in this case, the dissent's reasoning in Darby actually supports an affirmance here.
C
Beyond his inaccurate attempt to distinguish Darby, defendant also relies on the so-called "ether cases" to support his view that a trained officer's detection of the smell of PCP cannot, by itself, supply probable cause to search a vehicle (see e.g. Bailey v State, 412 Md 349, 987 A2d 72 [2010]; State v Ibarra, 282 Kan 530, 147 P3d 842 [2006]; People v Dickson, 144 Cal App 3d 1046, 192 Cal Rptr 897 [1983]). But the ether cases lend no support to defendant's argument here. In the ether cases, the officers all testified to smelling a legal substance (i.e., ether), and prosecutors attempted to justify the ensuing searches by arguing that ether is often associated with the production of illegal drugs. Such a theory, held the respective courts, strayed too far from the constitutional imperative of probable cause; instead of detecting illegal drugs themselves, the officers had merely detected a legal substance that could be associated with illegal drugs in varying degrees, and that attenuated proffer simply did not constitute probable cause to believe that illegal drugs were actually at hand (see Bailey, 412 Md at 375-388, 987 A2d [*5]at 87-95; Ibarra, 282 Kan at 533-543, 147 P3d at 844-850; Dickson, 144 Cal App 3d at 1053-1058, 192 Cal Rptr at 900-904).
This case is fundamentally different from the ether cases. Like the officers in Darby, Sanchez, and the other PCP cases cited above, Dorchester did not merely smell a lawful substance that he associated with the production of an illegal drug. Rather, Dorchester smelled the "pretty distinct" odor of street-level PCP itself. And while defendant may be right that "PCP is simply too unusual for the average person to have any concept of its smell" (emphasis added), Dorchester is not the "average person" given his "hundreds" of encounters with street-level PCP and his extensive training about that drug. It is the precise nature of the law enforcement testimony that separates this case (along with Darby and Sanchez) from the ether cases upon which defendant relies.
Notably, Maryland's highest court in Bailey recognized the key difference between Darby and the ether cases. As the majority explained in Bailey, probable cause was absent in the ether cases because the officer merely smelled a lawful substance that could be associated with drug-making, whereas probable cause was present in Darby and its ilk because the officer smelled the adulterated contraband itself (see 412 Md at 380 n 13, 987 A2d at 90 n 13). Unfortunately, defendant's brief failed to disclose the fact that Bailey discussed and distinguished Darby.
D
In his last attempt to escape the persuasive weight of Darby, defendant argues that we should simply reject that decision (and, by implication, Sanchez and the seemingly unanimous weight of authority nationwide). We could theoretically do that, of course. But we emphatically decline to do so. After all, defendant's rationale for rejecting those cases is remarkably thin, and it consists exclusively of an assortment of extra-record internet research that purportedly demonstrates that raw PCP has no real identifiable scent.
Defendant's internet research has no value in this appeal. As a threshold matter, it is improper for defendant to make arguments based on sources that are dehors the record, were not presented below, and are not even conceivably subject to judicial notice. In Matter of Justice v King (60 AD3d 1452 [4th Dept 2009], appeal dismissed 12 NY3d 908 [2009], cert denied 558 US 994 [2009]), we chided a trial judge for making findings based upon his "own independent factual research" (id. at 1453 [internal quotation marks omitted]), and we cannot allow a party to subvert both the record-based factual findings of a trial judge and the legal conclusions of a coordinate appellate court based exclusively on their attorney's prognostications about a complex scientific topic grounded on nothing more than internet research of unknown validity (see People v Jones, 73 NY2d 427, 432 [1989] [courts may not take judicial notice of "necessary ingredients [of a drug] from a hearsay source or from unidentifiable or nonindisputable sources outside the record or at a time subsequent to the close of testimony"]; CRG at Arnot Mall, Inc. v Feehan, 177 AD3d 1135, 1137 [3d Dept 2019] [improper to take judicial notice of fact that is "neither of common knowledge or determinable by resort to sources of indisputable accuracy"]).
More importantly, Darby itself has a succinct retort to defendant's 11th-hour attempt to introduce new scientific evidence concerning the odor (or lack thereof) of raw PCP: it makes no difference to the suppression calculus. As Justice Saxe wrote, even accepting, arguendo, that
"unadulterated PCP has no smell[,] . . . the officers stated that the 'street-level' PCP that they are familiar with, from training and from numerous prior arrests, possesses a distinctive, pungent odor. Therefore, [whatever evidence there may be concerning the odorless state of raw PCP] afforded no logical basis for discounting the officers' assertions that they had detected the odor associated with PCP. The officers did not challenge the odorless nature of PCP; they merely asserted that the street-level (i.e. adulterated) PCP they encountered on the job had a distinctive odor" (Darby, 263 AD2d at 113-114).
So too here. Dorchester never claimed that raw PCP has a specific odor — a proposition that would conflict with the internet research upon which defendant now relies. Rather, like the officers in Darby, Dorchester merely testified that the PCP he was trained in and had encountered "hundreds" of times on the street had a "pretty distinct" odor, and that he smelled that particular [*6]odor as soon as he approached defendant's car. Thus, even if we could consider defendant's internet research for any purpose — and we manifestly cannot — it would change nothing, for as Justice Saxe explained in Darby, the precise chemical process that created the distinct odor of street-level PCP is "irrelevant" to the existence of probable cause (id. at 114).
Lastly, defendant retreats to the slippery slope and predicts that an affirmance here "would permit police to search a vehicle simply because they smell something vaguely 'chemical,' even though that smell could just as easily come from any number of legal substances." Defendant's concern is unfounded. Any probable cause determination is necessarily fact specific (see People v Finch, 23 NY3d 408, 413 [2014]), and as the ether cases well demonstrate, the judiciary is perfectly willing to suppress in the hypothetical scenario posited by defendant, i.e., when the officer testifies only to smelling something "vaguely 'chemical.' " Had Dorchester testified in that vein, we would have no hesitation to suppress the cocaine discovered during the ensuing search, and we doubt that the motion court would have either. But the problem for defendant is that Dorchester did not testify in accordance either with the hypothetical posed in defendant's brief or with the police testimony in the ether cases. Rather, Dorchester testified plainly that, based on his extensive training and experience, he detected the "pretty distinct" odor of street-level PCP, and that, as Darby, Sanchez and the others have uniformly held, is itself sufficient to establish probable cause to search a vehicle.
II
Moving beyond the theoretical permissibility of a search predicated exclusively on a trained officer's olfactory detection of street-level PCP, defendant next contends that the evidence at the suppression hearing failed to establish the existence of probable cause to search the car in this particular case. We are unpersuaded.
A
In defendant's view, suppression is warranted because "[t]here was insufficient evidence regarding the smell of PCP" in this record to allow the motion court "to conclude that it is unique and distinguishable." As such, defendant reasons, the People failed to meet their initial burden of "going forward to show the legality of the police conduct in the first instance" (People v Di Stefano, 38 NY2d 640, 652 [1976]). We disagree. The People amply met their initial burden with Dorchester's testimony that he smelled the "pretty distinct" odor of a substance that he recognized, based on his training and field experience, to be street-level PCP (see Sanchez, 168 AD3d at 585; Darby, 263 AD2d at 113-114). Indeed, Dorchester's testimony was essentially identical to the testimony upon which the First Department relied to deny suppression in Darby (263 AD2d at 113-114). Moreover, Dorchester's testimony "sufficiently explained [his] ability to smell the PCP . . . , and defendant's arguments to the contrary rest on speculation and factual assertions unsupported by the record" (People v Carmona, 149 AD3d 670, 671 [1st Dept 2017], lv denied 29 NY3d 1090 [2017]).
To the extent that defendant claims that "the People did not present sufficient evidence about what PCP actually smells like," he is essentially asking for the impossible. As far as we are aware, no court has ever required a particularized, uniform description of a smell as a precondition to upholding a search predicated on a trained officer's detection of that scent. Indeed, describing a smell with reliable, uniform, and reproducible words is basically beyond human capacity.
Take coffee, for example. We all know the smell of coffee. If a person claimed to have smelled coffee at a particular location on a particular date, no one would question his or her capacity to reliably detect or report the scent of that daily staple. But what if that person was asked to describe, with words, the scent of that coffee? How would he or she do that? What word or combination or words would he or she use? And would that person's linguistic formulation even remotely resemble the linguistic formulation that someone else might use to describe the very same aroma? Of course not. No two people will use the same words to describe a smell, even one as omnipresent in society as coffee.
At the end of the day, trying to force a unique linguistic formulation on a smell would [*7]turn out like a wine list that announces, with great seriousness, the various "fruity," "oakey," and even "chocolatey" bouquets that purportedly emanate from its offerings (while often omitting basic information like vintage and terroir). Dorchester and the People cannot be faulted for failing to launch down that unworkable descriptive path in this instance. In fact, had Dorchester attempted to describe the smell of PCP in greater detail, defendant might now be placing that description under a microscope in order to discern even the slightest disconnect with the olfactory descriptions supplied by his off-record internet research.
B
Defendant next claims that "[t]here was insufficient evidence that . . . Dorchester had the necessary training to identify the smell of PCP." We reject that assertion. Dorchester testified that he learned about PCP in the academy, in regular training updates, and in "hundreds" of encounters during his career in law enforcement. That testimony, in our view, sufficiently established Dorchester's credentials to identify the scent of street-level PCP. Notably, Dorchester's testimony about his experience and training with PCP was not materially different from the corresponding testimony in People v Clanton (151 AD3d 1576, 1577 [4th Dept 2017]), which defendant holds up as the gold standard of police training and experience in drug detection. In fact, Dorchester arguably had more training and experience with street-level PCP and its unique scent than did the officers in Darby (see 263 AD2d at 113 [officers "explained that in their training at the Police Academy, and in the course of approximately 50 prior arrests for PCP possession or sale, they have learned to recognize the distinctive odor" of that drug]), and the First Department did not even pause to address the adequacy of their training before finding that their testimony, standing alone, established the requisite probable cause.
C
Finally, defendant argues that Dorchester's testimony was incredible as a matter of law because it "appears that he lied at the suppression hearing." According to defendant, Dorchester "appears to have made up observations of impairment for the first time at the hearing, [and] his testimony about the smell of PCP was likely fabricated to provide probable cause to search" (emphasis added). In fact, defendant continues, "[i]t is likely that, upon searching the car and finding PCP on the backseat passenger, [Dorchester] simply fabricated evidence regarding the smell of PCP[] in order to retroactively justify the search" (emphasis added). We emphatically reject this argument. Indeed, in our estimation, defendant's repeated and strident allegations of criminality against Dorchester transcend the limits of ethical appellate advocacy.
It is difficult to precisely capture the rationale animating defendant's assertion on this point. Defendant's brief does not identify any actual inconsistencies or contradictions in the testimony of either Dorchester or Brown. The brief does not reveal any implausibilities in either account. And the brief does not show that either officer gave testimony that was even remotely contrary to human experience or common sense. Rather, defendant seems to argue that Dorchester's testimony is a wholesale fabrication simply because Brown's written report and subsequent testimony were not literally identical in every respect to Dorchester's testimony. To that end, the brief identifies certain statements that Dorchester made that Brown did not echo precisely. But these are not "contradictions" or "inconsistencies" in any sense; the officers were on different sides of the car, they perceived the events from different vantage points, and they emphasized slightly different things in their accounts. Overall, Dorchester's testimony harmonized seamlessly with Brown's, and each account was entirely consistent with the other and did not contradict the other in any sense, material or not.
Contrary to defendant's further insinuation, the officers' failure to charge defendant with a driving offense despite his intoxicated presentation at the scene overlooks the fact that defendant was not operating the vehicle when the police approached it, not to mention the fact that defendant was charged with far more serious crimes. Moreover, although defendant makes much of the fact that Brown did not testify orally about the PCP smell, Brown explicitly noted the PCP smell in a contemporaneously-filed police report that defendant frequently relies upon at other points in his brief.
On balance, any failure on Brown's part to mechanistically corroborate each and every aspect of Dorchester's testimony shows only that he might have focused on other aspects of a fast-moving situation; it does not suggest, much less demonstrate, that Dorchester was lying or [*8]that his testimony was incredible. Indeed, the police and prosecutor faced something of a Hobson's choice here: had Brown corroborated every minute detail of Dorchester's testimony, defendant might now be insisting that human experience makes it impossible to corroborate another person's account so completely, and that the officers thus must have colluded to tailor their testimony. Upon our comprehensive review of the record, we see nothing that undermines Dorchester's straightforward and credible account of the underlying incident (see Carmona, 149 AD3d at 671; Darby, 263 AD2d at 113-114). It follows that the motion court's credibility determination should be respected, and its refusal to suppress upheld (see generally People v Nikiteas, 167 AD3d 1556, 1557 [4th Dept 2018], lv denied 33 NY3d 952 [2019]).
III
Separately, defendant challenges the severity of his negotiated sentence [FN3]. As a second felony drug offender previously convicted of a violent felony, defendant faced a determinate custodial term of not less than 3½ years nor more than 9 years, to be followed by a period of PRS of not less than 1½ years nor more than 3 years (see Penal Law §§ 70.70 [4] [b] [ii]; 70.45 [2] [d]). Defendant was ultimately sentenced, in accordance with his plea bargain, to only six months above the statutory minimum for each component of the sentence: 4 years' imprisonment and 2 years' PRS. Given defendant's four prior felony convictions and seven prior misdemeanor convictions, we see no reason to reduce either component of his sentence to the statutory minimum as a matter of discretion in the interest of justice (see People v James, 130 AD3d 1485, 1485 [4th Dept 2015]).
Accordingly, the judgment appealed from should be affirmed.
CONCLUSION
We have never shirked from admonishing prosecutors, when necessary, for falling short of the high ethical standards expected of those empowered to enforce the law in the name of the People (see e.g. People v Horn, 186 AD3d 1117, 1121 [4th Dept 2020], lv denied 36 NY3d 973 [2020]; People v Carlson, 184 AD3d 1139, 1142 [4th Dept 2020], lv denied 35 NY3d 1064 [2020]; People v Doty, 161 AD3d 1511, 1512 [4th Dept 2018], lv denied 31 NY3d 1147 [2018]). [*9]Indeed, in footnote 3, supra, we noted that the prosecutor in this very case had included a patently incorrect legal standard in her brief regarding the scope of this Court's sentence-review power. But prosecutors have no monopoly on ethical constraints, and we remind counsel that "all attorneys, including criminal defense attorneys, are bound by the . . . Disciplinary Rules" (Matter of Giampa, 211 AD2d 212, 215 [2d Dept 1995], appeal dismissed and lv denied 86 NY2d 731 [1995], cert denied 516 US 1009 [1995] [emphasis added]). Defense attorneys serve a vital and critical role as the quality control officers for the criminal justice system, but even they must adhere to fundamental norms of ethical advocacy — including the obligation to avoid gratuitous and unfounded accusations of criminal conduct against others (see Nachbaur, 300 AD2d at 75 [sanctioning an attorney for filing a brief that "makes baseless, serious accusations against the motion court, makes unsupported accusations against defendant, seriously mischaracterizes the record and makes no reference to recent adverse authority"]; McCurry v Kenco Logistics Services, LLC, 942 F3d 783, 791-792 [7th Cir 2019] [condemning an appellate brief for making what the court characterized as unfounded and outrageous allegations of criminal conduct against third parties]; see also United States v Alden, 527 F3d 653, 664 [7th Cir 2008] [admonishing criminal defendant personally for making "unfounded accusation[s] against third parties" as well as "slanderous remarks . . . against his attorneys and the [trial] judge"]).
Here, defendant's appellate brief levels serious allegations of perjury, official misconduct, and federal civil rights violations against officer Dorchester. The record, however, lacks any proof to substantiate appellate counsel's accusations. It is one thing to suggest that Dorchester's testimony was legally insufficient to justify the search, or that his testimony should not have been credited given Brown's failure to corroborate every detail thereof. That is proper, zealous appellate advocacy. But it is quite another thing to file a brief that directly, repeatedly, and unnecessarily accuses Dorchester of serious crimes without evidentiary support. Counsel's "baseless assertions are shockingly irresponsible" (McCurry, 942 F3d at 792), and such conduct "will not be tolerated" (Alden, 527 F3d at 664).
Entered: August 26, 2021
Mark W. Bennett
Clerk of the Court:



Footnotes

Footnote 1: Defendant offered no testimony or evidence of any kind at the suppression hearing.

Footnote 2: Even had the Darby majority grounded its holding upon facts that it never mentioned (i.e., the visual evidence of the defendant's drug-dealing in the moments before the police approached him), it still would not help our defendant given the parallel evidence of drug usage in this case (i.e., Dorchester's testimony that defendant's eyes were glossy, that his speech was slurred, and that he was obviously high).

Footnote 3: The People's brief claims that "[a] sentence that falls within the statutory limitations is generally not considered excessive." That assertion, however, is patently incorrect and conflates the legality of a sentence with the excessiveness of a sentence. A sentence is legal if it falls within the statutory limitations; a sentence is excessive if it, "though legal, was unduly harsh or severe" (CPL 470.15 [6] [b] [emphasis added]). In other words, our sentence-review power explicitly presupposes the imposition of a legal sentence (see id.), and the legality of a sentence marks the start, not the end, of our unique power to determine whether the legal sentence imposed by the trial judge should be reduced to a lesser legal sentence in the interest of justice. Indeed, by presuming the appropriateness of a sentence due simply to its legality, the People's argument would effectively nullify CPL 470.15 (6) (b) (cf. People v Pollenz, 67 NY2d 264, 267-270 [1986]; People v Potskowski, 298 NY 299, 303 [1948]). Contrary to the People's view, the Second Department's decision in People v DeMent (144 AD2d 690, 690 [2d Dept 1988], lv denied 73 NY2d 890 [1989]) in no way supports their conception of the Appellate Division's sentence-review power; in that case, the trial court imposed the statutory minimum term, and the sentence thus could not be further reduced on appeal (see id.; accord Potskowski, 298 NY at 303; People v Griffith, 181 AD3d 1170, 1172 [4th Dept 2020], lv denied 35 NY3d 1045 [2020]). We urge the People not to repeat this argument in future briefs (see generally People v Thomas, 194 AD3d 1405, 1406 [4th Dept 2021]; People v Cutaia, 167 AD3d 1534, 1535 [4th Dept 2018], lv denied 33 NY3d 947 [2019]).